If it please the Court, Steve Weiss, on behalf of Danica and Kira Nagel, who are the defendants in this case, for just for the Court's clarification, Mr. Wernicke is the father, well, he's the stepfather. He's the assignurer under a Morris agreement. He's the one that got sued. Yes. And when a matter of fact he was the driver of the boat. Pardon me? He was the driver of the boat. And when the Wernicke family filed the lawsuit, they named him as a defendant. I do not represent Mr. Wernicke. Okay. And I also, if it please the Court, would like to reserve two minutes. Judith Wernicke died in a tragic boat accident in May 2000. She was 47 years old. She was a pharmacist by profession, and she left two daughters. Her husband, James Wernicke, as the Court noted, was partially at fault for this accident. And what I have is a mark in the family insurance that says that Mr. Wernicke had insured all the world against his negligence except his wife. And that's via the so-called, the assertion or the intra-insured suit exclusion. We believe this case is controlled by this circuit's decision in FALMAS. And FALMAS, as the Court of Morris asked the Arizona Supreme Court to answer a certified question about the named insured exclusion, which it did in its own FALMAS case, and committed this Court to their decision in ABARET and also Gordon Muir. And this Court also, in DeSantis' FALMAS case, placed a great deal of emphasis on the DIMMA case out of Arizona. We believe that, as a general proposition, that no reasonable consumer would expect that his spouse would not be covered for his or her negligence, as the case may be. And conversely, we believe that a reasonable consumer would expect that his or her spouse would be protected. The exclusion question is unusual. It's unexpected to the reasonable consumer. And it essentially emasculates the coverage that's found on the declarations page. And as such, it's oppressive. Now, because it's oppressive under the Gordon Muir case, there must be thorough and adequate notice to the consumer of the existence of this exclusion. That's the law. But it is without dispute that the agent, Mr. Klatt, who is a captive agent of American Families, saw on their products no exclusion and said absolutely nothing to Mr. Warnke. And he was not shown a specimen policy at the time that he purchased the insurance. And that's the crucial time under the Millar case in Arizona, at the time of the transaction. Mr. Warnke indicated that a topic of conversation with Mr. Klatt would have been whether there was coverage for his family if he caused an accident. The declarations page recited that there was – now, there's two policies. There's the boat policy and an umbrella policy. And the declarations page on the boat policy says there's $300,000 worth of coverage. The declarations page on the umbrella policy relates to the boat owner's policy, so it's sort of a double thing. You've got $300,000 under the boat owner's, and you have a million dollars of coverage under the umbrella policy. And there was nothing stated in the declarations page that would have, anyhow, alluded him to the fact that that coverage did not exist for his spouse. And that's a very big factor in the Dimmer decision in Arizona. As I said, Alvaret was a case that was committed to this Court by the Arizona Supreme Court. And that Mr. Alvaret, when I called to his attention that provision, Mr. Alvaret said he didn't think – he didn't understand it. Mr. Warnke said he thought that provision meant that he couldn't sue himself, whatever that means. I suspect what he was really saying was that if I caused an accident and I injured myself, I couldn't bring a lawsuit against my own insurance company. Justice Slotnick in Alvaret said that this exclusion can exist, but it must be agreed to and it can't be imposed by an unwitting consumer. American Family takes the position that Mr. Warnke assented to this, although nothing happened at the time of the transaction that would support that. But what they say is, look, he renewed his policy at a later time. And he did, no question about it. He renewed it twice. He sent a check. He sent a check. Got a warrant. He didn't go in and have another conversation with the agent. But the bottom line is the first time he renewed it, he didn't know that there was no coverage, because he had not yet been sued. He had not yet gotten a letter from the agent, from the senior claims agent, saying they don't have coverage. Scalia. Wouldn't a person of ordinary intelligence reading the policy have concluded that there was no coverage for a family member? Warnke. Well, I think if I had lawyer reading, it could. And I think some people could conclude that. But at the same time, I have two different terms. One is a bad honest policy, which essentially is the named insured exclusion. And then I have a rebellious policy that uses the language of the intra-insured suit exclusion. And the point is that if he doesn't have notice, and this is after the fact, he gets the policy later on. So after the fact, he reads it, and he was confused. He thought he understood it, but he didn't, obviously. On that point, I am curious about one suggestion in your brief. And that is, in effect, you not only want to win at the Ninth Circuit, you want it to be over and have summary judgment directed in your favor. How is that possible, even if you're correct about the application of Thelmas, given the factual issue of whether or not that was a reasonable rule of law? Well, I'd like to win. And so, but I have said, I believe, in my brief, that if the Ninth Circuit doesn't grant summary judgment for us, at a minimum, there are factual issues, and therefore, those are issues that need to be decided by a prior fact. I mean, I said that in my brief. And there are factual issues. How in the world could the Ninth Circuit grant summary judgment in your favor? Well, it probably cannot. It probably cannot, but if you need to go out to the clarity issue of the policy. That was one of the things that the courts in Arizona talk about in terms of the clarity of the policy. And what you've got here is a problem there as well, because you have, again, the use of two different terms to describe what is apparently the same exclusion. Like the Dimmer case, like the Averitt case, like the Doe case, you have these exclusions kind of buried into the policy. And in this particular policy, the Bowdoin's policy, there's essentially two parts of it, both entitled exclusions, and they seem to be separate. One follows the other. And that buried — and this exclusion is, you know, like the exclusions for damages caused through war, damages caused through renting your car to somebody else. And so it's the same concept as the Dimmer case and the Averitt case in terms of the clarity. To sum up, if it please the Court, I think there are issues that need to be resolved by a trier of fact, whether or not, for example, Mr. Warnke really did understand whether he really did expect coverage, whether or not there was adequate notice, a whole series of those kinds of issues that need to be resolved by a trier of fact. Thank you. Okay. If you've got some time reserved, our clock is going a little haywire. We're not sure how much, but we'll give you adequate time. Okay. Thank you. Mr. Mariano? If it please the Court, this is — my name is Carl Mariano representing American Family. Obviously, our position is that Judge Teelborg was right. The policy language in both policies is clear and unambiguous, and the judge correctly applied the doctrines under Gordnier and Faulness and ruled that there are no fact questions and there's simply no basis for a reasonable expectations claim. What was the language of the exclusion in Faulness? In Faulness, and it's quoted in the decision, and it's important to note, Your Honor, that all of the policies that they're relying on are auto policies. I didn't ask you about the other policies they're relying upon. I asked you to tell us what the exclusion language is in Faulness. I will do that. I have it in front of me. Okay. It says there is no coverage for any bodily injury to you. Right? Right. That's correct, Your Honor. And it goes on. The laws on the Supreme Court said that's not clear. That is true, Your Honor. And if you look at page 3 — Well, if that's not clear, how can this be clear? I think it's important, Your Honor, to look beyond subsection C, which is quoted on page 3 of the Faulness decision, because it's important, as the Court explains. There is no body — there is no coverage for any bodily injury to you. That's C. Then it goes on in the Faulness policy, which is the same policy that was at issue in the Dimmer case. Under D, it says any, semicolon. And then there's a subsection, insured other than you, or another subsection, family member of an insured residing in the same household as the insured. And so what the Faulness court said, this court, and I quote, if the reader of C understood herself as you and that her bodily injury claim was not that as an insured, her claims would be covered, even a library might not qualify, quote, you, unquote, to find her way through this thicket. That's the Faulness holding. Now, what's our language? Our language does not have all of these subsections. Our language simply says we will not cover bodily injury to an insured. Both policies, in essence, say that. Our language is exactly the same language that was upheld in the Palance case, and that's a homeowner's policy, not an owner policy. And there are important distinctions between these policies. The Palance case looked at the same exact policy language and said, this is clear and unambiguous and enforceable, and they enforced the exclusion. And then... But it's interesting that in Faulness, the Arizona Supreme Court didn't even cite to that Palance case. It cited to several others like Abbrett and Gordon-Year. So, you know, it didn't even weigh that in. It seems to me we really have to take Faulness and find out if it falls within that case. Your Honor, I agree that Powers was not cited, but I think it's important because what the appellant wants to do is have this Court ignore the Palance decision and say that it's implicitly overruled. That is not the case. And I would agree that it's not implicitly overruled, but it doesn't – it wasn't of any persuasive power, so to speak, in the Faulness case in terms of distinguishing these kinds of clauses. So at best, it seems to me that we've got an – it's the Arizona Court of Appeals, correct? Right. Yes. So we have an Arizona Court of Appeals case, and then we have an Arizona Supreme Court case. And, Your Honor, I think that's an important issue you've raised. How do we reconcile these decisions? What do those principles mean, and how do they apply in our case? If you look at the Faulness case, the certified question was answered. And one way the Court could have answered that question is to say the named insured exclusion is just unenforceable. But it didn't say that. It said facially it is not invalid, but what you have to look to are the specific facts, the specific circumstances of that particular case. Now, what do you look to? You look to the policy language. What does the policy say in that particular case? What are the facts and circumstances surrounding the issuance of the policy? What did the insured say to the agent? What did the agent say to the insured? Were there any representations? Those are the types of issues or types of things that you have to analyze. So I'm wondering if that's true, why, given the record here, you just wouldn't have a trial and put that all on the table, because you have conflicting views about virtually every one of those issues in terms of what does it mean. What did it mean when he said, I want all my coverage? And what did it mean when he says, well, I don't understand this? Maybe a reasonable person would understand it, but he's unreasonable. So I wonder, in my view, I'm wondering why it just doesn't boil down to a big fat fact dispute. Your Honor, here's the reason why. It's simply insufficient for an insured to say, I didn't understand the policy. That's insufficient. The first level of analysis, is the policy clear and unambiguous? Our position is, Powers is good law. It has not been overruled. Fulmer simply said, look to the specific case. The best case we have in Arizona, on point, is Powers. Same policy language. Court of appeals say. It's on point. It tracks our policy language almost verbatim. And the court said, that is enforceable. It's clear and unambiguous. Okay. Let's get past that. Now, is the court going to not enforce clear and unambiguous language? The reasonable expectations doctrine. Powers cited Gordoneer, which is probably the seminal case after Donner, explaining the four limited circumstances when a court can not enforce unambiguous contract provisions. Now, let's look at our case. There really are no fact disputes. And actually, one point that's very significant. Now, arguing there are fact disputes. If you look at the underlying record, they filed a motion for summary judgment first. American Family then filed its own motion for summary judgment. In their opposition, they never argue there are fact questions. This is only something raised later, on appeal, after they've lost below. And here's the reason. Judge Tilburg relied on the insured's testimony. Mr. Wernicke's own testimony. There are no fact questions. So, based on Mr. Wernicke's testimony, do we fit within one of these four limited exceptions? Does his testimony include what I understand to be an asserted fact, that at the time the policy was obtained was purchased, a specimen policy was not available? Is that true? That's not a dispute, Your Honor. You're raising a good point. One of the factors under Gordoneer is, did the insured receive full and adequate notice? What they try to do is say, well, let's limit the time to when the insured met with the agent. That's the only relevant time under Millar. Millar does not say that. Millar simply says, subsequent events, I think in that case, State Farm had offered a certain amount of money to resolve a dispute about erosion under a house. That's not relevant. In this case, what happened was Mr. Wernicke met with the agent. There was no specimen policy. He signs the application. Seven to ten hours later, he gets the policy in the mail before the accident, which is typical. Mr. Wernicke admitted, I've been through this before. I'm familiar with that. I know that I'll get the policy later. What did Mr. Wernicke do after he got the policy? This is absolutely key. He admitted that he had a policy or practice of reading the entire policy. And, in fact, he read the policy in this case. There's no issue that he didn't read the policy. He's probably one of the few people in America that read this insurance policy, right? You know, that may or may not be true, but based on the facts in this case, he admits he read it. And if you look at page 59 of his deposition, and I'll quote it for you, because I think it's significant. Quote, as part of your careful review of the policy, you would have read the exclusion pertaining to the intra-insured exclusion in the umbrella policy. Answer, yes. How far off can you get? He gets the policy. He reads it. You know, if he had some subjective misunderstanding of what that meant and he didn't communicate it to American family, that is not a basis for avoiding or enforcing unambiguous policy provisions. Gordon, you? It's your position that there are no material questions of fact? There are no material questions of fact because we relied on Mr. Wernicke's deposition. If we conclude Judge Teelborg erred as a matter of law, then do you concede that we should direct the entry of summary judgment in favor of the Wernicke parties? You know, I guess, Your Honor, I'd like to know the basis for your decision before responding to that, but I agree that there are no material questions of fact, right? That's our position, yes. If we conclude that Judge, and I'm not saying we will or are or are even inclined to, but if we were to determine that Judge Teelborg erred as a matter of law, do you concede that the appropriate course would be to direct the district court to enter summary judgment in favor of Mr. Weiss's clients? Yes, because there are no material questions of fact. Of course. It's just interesting because he just got done saying basically the opposite. And we'll just leave it at that and we'll kind of conclude. That's the difference between how to resolve the differences between the Arizona Court of Appeals and the Arizona Supreme Court and how to resolve the polar opposite conclusions of counsel on the factual issues, because he got done saying he thought there were factual issues that would be reserved for trial and we'll have to sort that out. Yeah. And I would invite the Court to look at the underlying record. This was never raised. There was never a factual issue. It was only later after a court had ruled. There really is not a conflict between the Faulness case, the Dimmer case, the Averett case, and the Powers case. If you look at them carefully, Faulness simply said you need to go to the policy, you need to look at the specific circumstances of the case. The Averett case, as we pointed out in our brief, is totally different than our case in terms of the policy language and the circumstances. Powers is by far the case closest to our case. The Court held clear and unambiguous language, rejected the reasonable expectations doctrine. And it's our position that the same result should be reached in this case, that Judge Teelbrook had it right. Am I out of time? No. No, I'm not. I've got other questions. You're now at the point where I think you're repeating a bit of your argument. I think we have your argument well in hand. We understand your position. You've stated it quite well. Thank you. Thank you. Mr. Weiss, anything? I have nothing else. The case just argued to be submitted for decision, and we'll proceed to the next case.
judges: Hawkins, McKeown, Clifton